Case number 22-1059 et al. Tanaska Clear Creek Wind, LLC Petitioner versus Federal Energy Regulatory Commission. Mr. Super for the petitioner, Ms. Pasella for the respondent, Mr. Binette for the interveners. Good morning. Good morning. May it please the court, David Super with Bracewell. On behalf of Petitioner Clear Creek Wind, I'd like to is a wind farm in Missouri that's interconnected to a grid that's operated by Associated Electric. But this case is about the rules for allocating costs to address potential impacts from that interconnection, a neighboring grid operated by Southwest. And just to provide a very brief overview, I'll be addressing two points on the merits today. First, Southwest study, practice of studying the Clear Creek project using network service standards resulted in the allocation of costs to Clear Creek that have no relationship to the service being provided to the project in violation of the cost causation requirement and the Federal Power Act. Southwest studied the project using network service standards, which assumes that the Southwest system would support full deliverability of the project's load on Southwest system during peak periods. But the obvious problem with that assumption is that the project is located on an adjacent system and will not serve load on Southwest system. In fact, in order number 2023, FERC found that using network service standards for affected system studies results in a mismatch between service and costs in violation of the cost causation requirement. And second on the merits, even if using network service standards were appropriate, Southwest allocation to Clear Creek of 100% of the cost to remedy pre-existing overloads on the Southwest system violates the cost causation requirement because Clear Creek did not cause those overloads and shouldn't have to the Energy Resource Interconnection Service. But are you now suggesting that they won't use any of the NRIS system? Well, that is correct, Your Honor. Because of the study using network service and the allocation of $87 million in network service costs to Clear Creek, Clear Creek was forced to downgrade to energy-only service in order to avoid insolvency. Now, you spent $266 million toward the project. So if we're looking at cost causation, discuss a little bit about that benefit and burden, like why put this much money into the facility if there's not some benefit to you? Well, Your Honor, Clear Creek is perfectly willing and has agreed to pay the $15 million in energy-only related service for upgrades to the Southwest system. And that's appropriate because that is the level of service that Clear Creek has requested and will receive on associated electric system. But it should not be allocated any costs due to network resource service because it has not requested that level of service on the Southwest system and it won't receive that level of service on the Southwest system. Well, you have, I gather, expressed your intent to upgrade to... Correct. That is quite right, Your Honor. What happens then? Well, in the agreements with associated electric, whereby Clear Creek downgraded to energy-only service on the associated electric system, Clear Creek has the right to reopen that issue and revert to network resource service on the associated electric system. And that's an important right. Will you then face the cost you're complaining about now? Well, Your Honor, that is a question because Southwest has said in its briefs that if Clear Creek were to revert to network service on associated electric system, Southwest would study, would restudy the project using network resource service. And that's the fundamental problem that we think is improper in violation of the cost causation requirement. And that restudy could very well result in network service costs to Clear Creek that we believe are in violation of the cost causation requirement. It could come out exactly the same way. It could, very much. Yes. Would any of those costs be passed on to your purchasing customers? I'm sorry? Would any of the costs be passed on to your purchasing customers? Well, Clear Creek is not in a position to pay the network service costs of $82 million. That's why Clear Creek downgraded to energy-only service, because it was faced with impending insolvency due to that, those ruinous levels of costs. And so that's why it had to revert to a lower level of service that is not as favorable to Clear Creek as the network service is. We don't have that agreement. The November, I think it is agreement with the associated, right? That is correct. Is there a reason? Well, the agreement is confidential to my understanding, but it is in the record. I think both sides have pointed out the fact... Correct. And both sides have pointed out the fact that Clear Creek does have the ability to revert to the greater network service. As I read it, you have the ability to request that. That is true, Your Honor. So, what value is that? Well, it is valuable because network resource is a much more valuable level of service. Generators on associated electric system who have the network resource level of service allow associated electric to utilize those generators to serve load. So, network resource service is actually a valuable service to associated electric as well as Clear Creek. Clear Creek, of course, benefits from the higher level service, but it is offering a higher level of service to associated electric as well. So, there would be incentives for the parties to agree to allow Clear Creek to return to network. I am not sure what you got out of this agreement. Does it hold your place in line? Well, if we were subject to restudy based on network resource service, presumably, Clear Creek would have lost its place in the queue. But, Your Honor, we think that is the study based on energy only service and Clear Creek is willing to pay that $15 million. It is our view that we should not be studied under the resource service standard. This is standard in the protocol for Southwest, right? I am sorry? This procedure is standard in the protocols internal to Southwest. That is correct. Southwest utilizes both approves it on the ground that it is a prudent measure, a prudent step. And in this instance, where you will yourself say you want to return to network service as soon as possible, it certainly seems like a prudent step. To return to network resource service? No, for Southwest to evaluate, to do the study based on network service. Well, Your Honor, Southwest studies Clear Creek utilizing the network service standard based on an assumption that Southwest would be utilizing the Clear Creek project to serve load on Southwest system. That is why Southwest does that study level. The fundamental problem with that assumption is that it is false. Clear Creek has never requested network level service on Southwest system. Southwest has no obligation to provide that level of service. This is your key point, right? What you are reserving the right to do is return to network service on Associated Electric, not on Southwest. Your Honor, that is 100% correct. That is exactly correct. We are unable to return to network resource service on our host system, Associated Electric, because Southwest is holding us hostage because it has been studying the project based on network resource standards that, again, apply to a level of service we have not asked for and will not receive on Southwest. So the obstacle for you on that claim, just taking it on its face, is that in these orders, Burke said that it had just very recently in two other orders approved this practice, allowing the transmission organization to decide whether to assess this type of situation under network or energy resource. And in your opening brief, I did not see where you addressed those two orders that Burke relied on. Well, the order in our opening brief was the notice of proposed rulemaking. The final rule was issued about a month after our initial brief. And, of course, we did point to that final order in our reply brief. But I think that the... And the final order is prospective only. And your argument is that it was arbitrary and capricious even before that rule was final. That's exactly right, Your Honor. We're not asking for this court to retroactively apply order number 2023 in addition to the recent denial of the hearing request on order number 2023. We just ordered 2023. Because I wasn't sure of the way you phrased it. Isn't it the case that you've always sought access through Associated? We do have access through... We're attached to Associated Electric. And the only way in. That is exactly correct. And this case is about assessing what impacts our use on Associated Electric have on Southwest. And the question is, what standard does Southwest use to study our impacts? And our argument is they're studying us based on a standard that we don't receive from them and haven't requested. And I think order 2023 by Burke is very important because we're... Again, we're not asking this court to retroactively apply order 2023. But in that order, Burke adopted the exact arguments we've made in this case. Burke has said in that order that the use of network resource service for an affected system study results in a, quote, mismatch between service and costs. Every single one of the arguments we made in this case, Burke has now adopted in order 2023. So we're not asking you to retroactively apply that order, but we are asking you to reach the same decision that Burke reached in order 2023 in this case. Because Burke has made no bones about it. It has said that studying, doing an affected system study, utilizing energy only service addresses all of the potential reliability concerns that may arise. It's not necessary to study an affected system using network resource service. And to do so is creating a violation of the cost causation requirement because there is a fundamental mismatch between the costs paid and the services provided. That order is pending petitions for review, right? That is correct, Your Honor. It's on abeyance at the moment. We is now pending before this court. However, I would posit that this case is now the lead case far ahead of that one on this exact issue. And so this case could be influential on the other proceeding. I'm sorry. Are you objecting in the other proceeding? Are we objecting to the result of what? No, we think that FERC got it right in order 2023. So you're there just as an intervener. We should. We should. We haven't yet. But we're asking for this court to do the same thing that FERC has now done in order 2023 for the exact same reasons that we raised in our brief. That there is, there's no reason to study an affected, to do an affected system study based on network resource service. Can you operate under NRIS with respect to ACI, but then get network resource service on associated electric system? Southwest has taken the decision. It must study our, the impacts of our interconnection requests using the network resource. And what other generators do you hold responsible when you're talking about that it's not fair to you to bear all of the costs? Well, that's a kind of another issue that the other problem with, with FERC's orders in this case is they approved Southwest's allocation to Clear Creek. And that's a percent of overloads that were caused by other parties. And Clear Creek should pay for its portion of those overloads. But in one instance, the Nashua, Nashua transformer, they were preexisting overloads that were three times greater than Clear Creek's incremental impact. But is it their argument that you are the but-for cause that your particular impact causes the need for the upgrades? Really two answers to that question, Your Honor, that first, the but-for policy is a FERC policy and it doesn't supplant the requirement of cost causation, which is fundamental to the Federal Power Act as this court has recognized. So, but the other point is that FERC has never really explained how Clear Creek could be the but-for cause of an upgrade when there are greater preexisting overloads on that facility. Because those overloads didn't require additional infrastructure. Well, then... There are overloads over a rating, which is obviously a prudent ex-ante rating. And it turns out the system is working reasonably well with, with what you call it, what they call an overload. Well, Your Honor, in the case of the Nashua transformer, there were preexisting overloads up to the level of 110 percent. And then Clear Creek comes along and adds three percent. And so, if that... I understand that you're the marginal customer. It's just marginal cost causation. It's a fundamental utility regulation principle across all of these schemes. Well, Your Honor, I think this court has rejected schemes where, where one party that causes one percent of the costs and the parties who cause two-thirds of that overload get away scot-free. What case are you thinking of? Well, I'm thinking of Consolidated Edison. Yeah, totally. That's just totally different. That was the case with the huge zones, right? I mean, it was, it was not... That was like astrology. Well, Your Honor, I do think that that case focused on the fact that the de minimis process being used in that case, which admittedly was different, produced absurd results. And I think the split there... What's your better case or other case? Well, Old Dominion is another case that recognizes the cost causation requirement. And there, this court recognized that a party that was receiving only 50 percent of the benefit of a particular project should not have to pay for 100 percent of the costs. And... Was that a planning case? I'm sorry? Was that a capacity planning? There was a transmission case. There was a transmission, an interconnection? It was not an interconnection case. But in our view, Your Honor, that the policies that underlie transmission are the same that underlie interconnection. That's not the commission's view. Well, in the end... That's not just this case. That has been their distinction they've maintained. I think in the Entergy case, though, this court said that interconnection was just a subset of transmission. But didn't you also benefit... I think the example was used that there were 24 constraints in another setting. You're right, Your Honor. Yes, that's the... We've been kind of calling that the win some, you lose some approach that Southwest applies to its de minimis practice. And the idea is that because there are other overloads where Clear Creek may not trip the 3 percent de minimis threshold, that's considered somehow a benefit. But the problem with that is that FERC does nothing to say whether those alleged wins are in any way roughly commensurate with the $87 million in known costs, the loss that Clear Creek is suffering based on the overloads where it is being required to pay 100 percent of the cost. So there's no roughly commensurate analysis being done by Southwest and FERC in that situation. It truly is just, well, you win some here, you lose some there, but no attempt to... You're arguing some kind of equitable proportionality. Well, this is actually a response to FERC's argument on cost causation. They say that... That's just explaining how it works, right? And the next person that requires... Next connection that requires an upgrade on those will pay for your capacity. That's just an inevitable consequence of how they operate. Well, the fact that it is an inevitable consequence of the operation of Southwest de minimis practice, Your Honor, I would suggest doesn't mean that it satisfies the cost causation requirement. Because if you've got a situation where the accumulation of preexisting overloads grows to some unlimited amount, but no preexisting customer trips the 3 percent threshold, and then along comes some unlucky customer who does, there's no cost causation basis upon which that subsequent unlucky customer should have to pay for the entire overload that's been caused by many parties. And that is a fundamental violation of the cost causation requirement. You're just exploiting their terminology because it's an overload. It's functioning properly, and now you need something that would require upgrading the system. Well, Your Honor, if there's a 10 percent overload, 10 percent over the rated capacity, and Clear Creek adds 3 percent to that overload, if the 10 percent isn't causing any kind of reliability problems, then there's a question whether there's an overload problem to begin with that needs to be corrected by Clear Creek. Well, as I said, you're just exploiting that term overload. It's obviously load. Well, I'm not sure I'm... And that was probably prudence at the time, but it turns out perhaps with later efficiencies or something, they could carry more. Yeah. Well, I'm not sure I'm exploiting the term overload. I mean, there is a 10 percent overload on the Nashua Transformer that presumably is causing a reliability problem. Oh, but they said it isn't. Then if it isn't, then why does Clear Creek's 3 percent addition to that 10 percent overload all of a sudden cause the... At some point, obviously, there will be a reliability problem. Well, I think that's where it becomes so arbitrary because they decide there's a reliability problem when some unlucky customer happens to have a 3 percent impact, and it's completely arbitrary. You could have 15 customers with a 2.9 percent impact and a 50 percent overload beyond capacity, and yet one customer with a 3 percent de minimis threshold somehow trips that problem, and all of a sudden you have a reliability problem. You asked for a vacator as well. Is that your only acceptable remedy, and what would you find to be the fundamental flaws in the commissions? Well, Your Honor, we would ask for a vacator and remand back to FERC. And the problems we identify here, number one, Southwest was incorrect, and FERC was incorrect in allowing Southwest to study the Clear Creek interconnection using the network service standard, a level of service that Clear Creek has not requested and will never receive on the Southwest system. That's number one. Number two, the fact that Southwest is requiring Clear Creek to pay 100 percent for preexisting overloads that Clear Creek did not cause, at least in their entirety, and that other customers of the grid will benefit from. And third, the fact that Southwest and FERC are using this arbitrary 3 percent de minimis threshold to justify requiring the unlucky customer who comes along to have to pay for preexisting overloads on Southwest's system. Counsel, in this situation, is there a practical difference between us vacating and not? If we were to agree with you on one of these grounds, the remand, is there actually a difference between vacating? It seems like you've effectively been denied what you want already. And normally, vacator matters when there's sort of ongoing reliance on an approval. Yeah, I'm quite confident that my client would be satisfied with a remand and an instruction to FERC that Southwest is not to use the improper network resource standard in studying Okay, and then on the cost allocation issue, I just want to understand a little better what exactly you're proposing. We can use Nashua as an example. Are you saying there's at least, well, there could be many different versions of it. You could be saying that it's reasonable to upgrade should somehow be calibrated to that 3 percent, or you could be saying we should actually go and charge the prior de minimis contributors to contribute to the bigger upgrade. Presumably could be many other things as well. And the second part of that question is very complicated. I think our first proposal is this. The usage of the network resource service, that accounts for all of the network upgrade. I understand that. I'm talking about your complaint about this application of the de minimis threshold. Yes, I think, Your Honor, the thing to do there is to require Southwest and FERC via Section 205 of the Federal Power Act or Section 206 to revisit Southwest's process for doing these kinds of allocations. Because a system whereby an interconnection customer is being required to remedy pre-existing overloads that far exceed that customer's contribution is a violation of the cost causation requirement, and it is incumbent upon the agency and Southwest to figure out a better way to do it. See, my time is up. We'll save two minutes for rebuttal unless you have questions now. Okay, thank you. Good morning, Your Honors. Beth Casella for the Commission. I think I'm going to start with the use of network resource interconnection service standards. The Commission has already found that Southwest's use of NRIS standards is just and reasonable, and it found that in the Mid-Continent case. And so, so TANASCA's burden here is to show that that's no longer true. And the Commission explained that it's appropriate for Southwest to use, to study the interconnections effect on a system using the higher-level interconnection service TANASCA requested to ensure that the transmissions, that Southwest system will remain reliable and that there will be proper cost allocation. Energy Resource Service only allows TANASCA to put its generation on associated electric system on an as-available basis, and the NRIS service allows it to do it basically as a firm service, as continually, as much generation as they have, they can put on the system. And the effects are certainly different on Southwest system, whether it's ERIS service or NRIS service. We know that. So, and the Kelly affidavit explained that Southwest does this to ensure that its system can accommodate the level of interconnection service requested, not that there will be deliverability on Southwest system. And the Commission always, in the Mid-Continent case at paragraph 60, the Commission explained that, let me find that. The Commission explained that TANASCA, that the study does not, that SPP does not study the effected system interconnection as if the generator's output will be delivered on SPP system. It studies it as if it's going to be delivered on the host system. And that's in Mid-Continent 171 for 61-275. The Commission explained Southwest's effective system study sinks the interconnection request into the host system's footprint. So, it's the effects of sinking it into the deliverability on the host system that still causes these effects on the Southwest system. The flows happen automatically on Southwest system just by virtue of the deliverability happening on the host system. And that's why Southwest studies it under this higher level NRIS service. So, in the 2020, oh, please, please. In the 2023 order, FERC has now ruled that SPP shouldn't do that. That's right. The way you just explained it made it sound sort of inevitable that network resource standards should be used. So, what's changed? So, a different record, Your Honor. And let me first say, and I'm sure you know this already, but I can't, as first lawyer here, not point out that that is what the Commission has said in order 2023 is literally irrelevant here. The court cannot, I mean, in Brooklyn Union Gas, for example, as we pointed out in our brief and in the McLeod decision, talked about in the Brooklyn Union Gas decision, the court said the subsequent decisions are irrelevant in any event. We will not reach out to examine a decision made after the one actually under review. The court said an agency's decision is not arbitrary and capricious just because it decided something different later. So, understanding, and I'm happy to talk about it, but it really is irrelevant here. But if it weren't irrelevant, it just, the Commission had a different record. You know, it was a rulemaking, and it didn't involve just the record here. It involved all the decisions that, again, will be addressed by the court on review later on. In addition to that, Can I ask about the other issue? So, one thing Bear Creek says is that the way you've justified imposing all these costs on them is, well, you're the first interconnector that required an upgrade. And what they say in response is, but your way of determining when an upgrade is required is you can have a 10% overage, a 10% contribution, and the policy says no overage, no upgrade is required. But if the first interconnector had been a 3.1% instead of 2.9%, the policy would say upgrade is required. What the Commission explained about that is that the use of the de minimis threshold is consistent with cost causation because it's consistently applied to everybody. So, and it does matter that it cuts both ways. I mean, that's not just a side point. That's part of it. It's consistently applied, and it cuts both ways. So, an interconnection customer and... So, put aside the cut both ways point, you agree it seems very odd that a one interconnector, one generator responsible for 30% of this overage is being charged for 100% of the overage. Yeah, because use of a de minimis threshold is appropriate. The Commission found that the use of de minimis threshold is... Using a de minimis threshold to say when someone comes in with a very small addition to say we're not going to require them to pay for an upgrade makes a lot of sense. It's a different question whether it makes sense to tag the last person in line who comes in after 10%, 20%, 30% overages and then says, well, you've got a 3.1% and everyone else had 2.9. So, you're going to pay for an upgrade to account for 31% of a capacity upgrade. So, that's literally how de minimis thresholds work. You could attribute the costs in other ways. You could say we're going to let those de minimis contributions add up until our annual planning process says they're actually creating a reliability problem. That is how it works, Your Honor. Then why isn't that what happened in this case? Because it didn't end up being a reliability problem on the system as a whole. Interconnection customers have to pay for network upgrades that are necessary to accommodate their own interconnections. So, as long as they are above a de minimis standard. And so, if the de minimis uses, you know, the de minimis upgrade effects added up to enough to cause a reliability system, a reliability problem on the system, it would be part of the base case. It would be accepted and it would be addressed in the annual transmission planning process. And so, there is, that is packaged into all of this. I appreciate that. So, I guess what's troubling, what remains elusive to me is why, if they come in with a 3% increase, why aren't they required to make an upgrade that offsets that 3%? That is what they're doing. They are making an upgrade. They're not complaining that the upgrade is too broad. There's no argument here, and there could have been one. So, is this the same exact upgrade at the same exact cost, whether there was a 3% overage or a 13% overage? In other words, that seems to be their whole complaint, is that the upgrade gets bigger as the overage goes up. And you've required them to do this kind of an upgrade instead of this kind of an upgrade. I don't think they're saying that the upgrade gets bigger. I think that they are solely responsible for the upgrade. I think the, I don't, I've not seen any complaint in this case that the upgrade is larger than it would need to be to accommodate their argument. And perhaps they were. I don't know. I've not seen that argument. If the petitioner here is correct, and you were to be, you could charge them only, let's, if it's, they're taking it from 110 to 113 of the rated capacity, then they, then you would go back, I guess you would have to go back to the previous people who came in without paying for upgrade facilities and say, surprise, you've been on the system for a while, but now we're going, you're going to be charged an additional, whatever, tens of millions of dollars. That's right, your honor. I mean, it defeats the whole purpose of using the de minimis threshold in the first place. And so really, I think, well, it also strikes me as creating a significant problems for the infomercial customers who might not have built, might not have requested service had they had more in that kind of a price tag. That's right. And that's not provided for in the tariffs go back to prior cued customers to, I mean, what would happen if it's even viable, would it just result? I shouldn't say just, would it result in then that going into their, their rates? If you, I mean, the additional expenditure would go into their rate base. I just, I guess it would go into their rate base, but the point is, it seems like retroactive rate making. Well, yes. I mean, where's the file rates out? Right. So it's, but, and judge Garcia, I just want to say, if you can't really separate out the part about, it cuts both ways. And I know for purposes of discussion, that's fine, but that is part of the commission's decision-making. That's what makes it roughly commensurate. It's consistently applied. Minimum threshold is consistently applied and it cuts both ways and roughly commensurate. It doesn't require that the commission does a, oh, well you, it, it ends up for sure being even for you exactly even over time. It just, this is how it works. And it's a practical, as the commission's found just a reasonable way. Yeah. I just want to make sure I understand your answer on something earlier. So it seemed to me that there was a shared assumption in the briefs that like in some practical sense, what Clear Creek is required to pay for is more because they were pre-existing overages. They are paying more. Not that it's just 100% of what they would have been responsible for, even if they were first, but that it takes more money to remedy 13% overage than a 3% overage. Is that correct? You know, I apologize that I just, that wasn't addressed on the record here. I just don't know the answer to that. There's one piece of evidence that bears on this. Some of the upgrade involved line, upgrading lineage. And that the cost of that is per mile. The cost of putting in an up, putting a step up transformer is fixed. That's right. It's not responsive to degrees. It's lumpy capital. And if it costs $10 million, there's no way to just put in a third of it. You have to put in the whole thing. But with mileage, it's obviously, you know, clearly responsive to distance. That sounds right to me. I just, I don't, I just don't know the answer, but what I can say is they, I have not seen an argument from Clear Creek saying that the upgrade should have been smaller. It's you either have an NRIS upgrade or you don't have an NRIS upgrade is the way I've understood the case. And that's my understanding. Now, the orders don't speak to that. Well, do the prior contributors bear any responsibility once you've asked Clear Creek to pay for the upgrade? No, they do not, but they pay for their own, but they, well, it is really an illusory benefit because they get the interconnection without having to do any upgrades anyway, because they don't, they're not the but-for cause of the upgrade. Now, why did the actual upgrade cost change over the course of four years? It seemed like 11 times or so. You start out at $33 million, got as high as $763 million, back down to $100 million. I mean, why would that not be? I don't, I can't explain the $760 million, that one. But so, you know, part of it was originally, and again, it's not being litigated here, but Southwest improperly out 4.5 gigawatts of service. So that was left out of the NRIS part of the original study. And when the, when Southwest was able to, when higher queued interconnections dropped out, Southwest appropriately did a restudy, and the commission found it was appropriate for them to do it properly. It wouldn't have changed, if they hadn't had the opportunity to do a restudy, that 4.5 gigawatts never would have been considered. But it, in doing it, it was proper. So that made a big difference. And then another factor was, I think it's COVID, because it's COVID time. The costs went up so much, because in 2020, the cost of labor and materials were so high. So it doesn't say it's COVID, but it was during that time period, it's 2020. So I think that's what caused the cost to go so high in part. And in your brief, in terms of justifying reliance, or pardon me, proving the company's Southwest reliance on the NRIS level of service for evaluating cost, you refer to in two places, this is a 44 and 45 year brief, a little bit beyond, to the justifications being reliability and proper cost allocation. Right. Reliability seems, I see how you could say, you know, it's clearly if they're planning, if they're anticipating a network service, when in fact energy service is going to be required, that gives them a cushion, a guarantee that they'll never be overloaded with that. But why does that improve proper cost allocation? Because it acknowledges the but-for-cost aspect, who the but-for-causer is. And so if you are causing NRIS level flows on Southwest system, you should be paying. Okay, but then if they're requesting only interruptible service, why does that still apply? If they're requesting only interruptible service, then it would only be studied under the NRIS level. Maybe I used the wrong term, energy service. Right, if all they requested was NRIS service, Southwest would study it only under NRIS service. It's only if... But now, I thought, now they are, they did request it, they've downgraded... Now they've downgraded, and so Southwest has explained in its brief that that means, and that's why this case is moot, which we haven't talked about. If we ask, is the harm to eminence, right, as part of the Lujan? But it's not, because... Well, since it's quite clear that they want network service and will apply for it. I understand that, Your Honor, but the, it's just speculative. It's speculative... No, no, that's the right point. It's not. They need and want network service, and they've agreed to have some kind of arrangement with... I understand that. That may not be speculative. What is speculative is that Associated Electric's third party will agree to change the purchase power agreement and go back up to network service, and they may or may not need network service from Tenasca at that point. They might need it, power, all that they generate, they may not need it at that point. All right, so that was the basis for your argument on standing. Just mootness, I mean, yeah. Our mootness part, yeah. Which we didn't argue, because it happens... Now, just take that out of the equation. Okay, sure. And tell me why it is that planning, pardon me, evaluating the cost for network service is cost allocation purposes, when all they want is energy service? Now they're responsible only for the energy. There's one ERIS upgrade, and that's all they're responsible for now. They never pay the costs to have the upgrades done, the NRIS upgrades done, and they're no longer responsible for them. Those costs are gone. That's why it's moot. I mean, those costs are... Going down to ERIS service meant that the NRIS upgrades are no longer... They're no longer responsible for them. Someone else will pay for those if they're necessary. So, all of the petitioner's argument was unnecessary here? No, it was necessary when, I guess when they... I mean, mootness is an in-time thing, right? When they filed their brief, they hadn't yet gone down to ERIS service only. No, but they have, before they presented the argument half an hour ago... Yes, it is all... Yes, there's no more... They have no obligation to pay for these upgrades, for the NRIS upgrades, and they have no problem paying. So, it's only then, in the event that they later switch through Associated, come back with network service, that they would incur this cost? And SPP's position is that they, and FERC agrees with that, is that we don't know what those costs would be, because they would have to be evaluated at that time. As SPP's brief explained, the practical effect of TANASCA Clear Creek going from NRIS service to only ERIS service means that they're not responsible for those upgrades, and they're taken out of the queue, and we don't know what the situation would be at that point. They might be... What could change? Anything could change. They could have... I can't imagine they'd have the exact same upgrades. It's a period of time later, things change. We don't know what the upgrade level would be. We don't know if... Why would, you said, just because the time passes, why would that change? Because the factual scenario would be different. Instead of the grid at that point, the de minimis impacts on the... Their impacts on the grid might be de minimis at that point, because the grid will be different. Because someone else will have... Yeah, someone else will have paid... Or just because of the annual changes that happen to the grid. All kinds of upgrades happen all the time on the grid. The costs could also go down, right? Costs could absolutely go down. And one key difference between standing and mootness is who bears the burden, right? So would count against the petitioners. But when we're talking about mootness, it's on you and Southwest to show it is unlikely that they will re-pursue network service. I think, Your Honor, it's unlikely that they... I don't think it's speculative that they might ask for it. It's just speculative whether they would get it and whether they would have the same package of costs they might have. Theoretically, they'd end up with no network level costs. We don't know. We literally don't know. But I feel confident in our merits, and I'm not going to belabor the point on mootness. You are taking the position the case is moot? I am. Yes, we are, Your Honor. Yes. Just looking at my notes to see if I've talked about everything I want to talk about. Well, just a couple of things. Yes, Your Honor. That Clear Creek is challenging how you've used the network modeling studies and whether you've been consistent in that regard. Would you like to speak to that? I'm sorry. Well, just the modeling, just your whole study with respect to the network modeling, they seem to have challenged that you've been inconsistent in your application as you do these studies. I don't know what issue that is. I'm sorry. I'm not getting the question. I apologize. What claim is that they're making? Well, they've just indicated that – I'm sorry, not commissioned. I know what you mean. Yes. Inconsistent in applying the modeling practices and the thresholds just generally. The SVP has done so. Do you have any response to that? I don't recognize that argument. I don't know if you're talking about they're being curtailed. Is it about the curtailment? Is it about – I don't think – I don't recognize an argument they've made that we're not – Okay. Let me just move on from there. And then just on Vacator, you want to respond to that would be their request? I mean, I think that's Your Honor's decision. We obviously think the order should be affirmed. The commission certainly could give more reasoning if the court felt that was necessary. I think the orders actually answer everything that was raised to the commission on re-hearing. There are a number of things that weren't raised to the commission on re-hearing that aren't properly before the court. But I think that's really up to Your Honors. And certainly, we – obviously, we don't think Vacator is appropriate. But we leave that to you. Thank you. All right. Thank you. Good morning. May it please the court. Matt Bennett for Judge Childs. You just asked that my colleague, Ms. Pacella, was not following. I believe that Tenasca Clear Creek has suggested that SPP has not applied the NRIS or the network resource standard consistently. It has throughout its interconnection process. The study that they're talking about in their brief and in the underlying record in this proceeding is a planning study, a conceptual study that SPP and its neighbor, Mid-Continent Independent System operator, have decided to pursue outside of the interconnection process to identify regional or inter-regional upgrades that may help alleviate problems along their border. It has nothing to do with the interconnection process. Every generator, whether they connect to SPP or whether they connect to a neighbor that requests the higher network level service, is studied under that. And they're also studied under the energy service to give them an idea of what the cost differences would be. Judge Childs, you also asked a question about why were there so many different studies and changes in the cost. Well, the answer is this is a very complex process. If a generator drops out somewhere, SPP has to determine whether to restudy. Restudies cause differences in cost, cause differences in flows. You know, throughout the system, SPP is analyzing the Mid-Continent system, the SPP system, and the AECI system all the same time. And typically what happens is, this is not unusual, but typically what happens is the generator waits for the results of the studies before they pursue construction. In this case, what Tenasca did is they entered an interconnection request with AECI. They initiated the interconnection process with SPP in August of 2018, and only 16 months later entered commercial operation. The way they rushed through this process without waiting for the results of the studies, it's no surprise that their interconnection costs have changed. I mean, that's just the nature of the business. Most generators wait until they actually have a little bit more certainty about the costs. If you look at two of the generators that Tenasca complains about, one of them is the white cloud generator, I believe, and the other is a mid-American energy generator. Those two but they ended up not coming into commercial operation until after Tenasca, and the reason for that is they waited for the results of the studies. Tenasca didn't do that. With respect to the NRIS, and I apologize for the acronyms, I know this court doesn't like acronyms, but in the underlying docket, SPP submitted expert witness testimony to exactly why we apply the NRIS standard to NRIS requests on neighboring systems. That's at JA 170 to 171. FERC credited that testimony in this case. FERC has to make its decision based on the record. We had a record basis for explaining why we apply the NRIS standard. The fact that FERC has now changed its mind three years later and is no longer going to allow that under Order 2023 really is not relevant to this case, I think, for the reasons that Ms. Pasella mentioned. In addition, Order 2023 actually, and I believe it's one of the paragraph sites in front of me, Order 2023 actually permits individual transmission providers to come in and explain to FERC why they may need to still apply the higher standard. So it's not a foregone conclusion that SPP will not even in the future be able to apply the NRIS standard. And I'll also note, and I think this was noted, we have that issue on appeal. So whether that portion of Order 2023 ever goes into effect is still unknown. So it should have no bearing on this case. Can I ask, so one thing I would love to hear a little more about is, one, when you apply the de minimis policy, right, in a situation where you have multiple 2.9 percent upgrades in a row, you can get to, say, a 10 percent overage, and the SPP policy says no upgrade is required. But if the first one had been 3 percent or 3.1 percent, it would say upgrade is required. Can you just, just as a practical way of when is an upgrade required, can you help me understand how that makes sense? Yeah, I think the trouble with me being able to explain a practical way is I'm not an engineer. But SPP has made an engineering judgment that when a network resource service interconnection customer, who on their host system has the right to flow power constantly, it's not, you know, it's subject to curtailment only for emergencies, is going to have significant impacts on the SPP system. The other generators that SPP studied did not have that same impact, for whatever reason. It could be that they didn't request network service. It could be that where they're located on the grid, the grid is sufficiently fortified that we don't really have to worry about that. SPP has determined that certain overloads can be managed. Others can't. And when you have this sort of stacking, as they suggest, you know, we might get up to 50 or 100 percent, that's where the regional planning process comes in. SPP looks at the region's transmission system, identifies constraints that are going to cause reliability problems, and proposes a regional or even an individual transmission owner solution to that problem. They don't pay for that. That's paid for by customers in their transmission server. So SPP has made these determinations on an engineering basis that there are certain overloads that we can manage around. You can redispatch. You can take other measures. You don't necessarily get an upgrade every time there's an overload. And when those overloads stack up, it doesn't necessarily mean that the next generator in line is going to pay for it, because it could end up with a regional planning solution. Okay. And then the other question is, assume I think it matters whether the upgrade to remedy a 13 percent overage is bigger and more expensive than the upgrade to remedy a 3 percent overage. Or if it's somehow off the shelf, you know, you either got to put up another line or not that costs exactly the same amount. Do you know the answer to that? No. You really have to look at the study and look at solutions. And in one of the studies that's actually in the record in this case, I'm not sure if it's in the joint appendix, the consultant went into detail about how they considered alternatives to one of the projects that Tenasca is being asked to pay for and determined that the solution that they came up with was the most cost effective. And cost effective doesn't always mean cheapest, but it's most cost effective. So the fact that there's a 13 percent overload versus a 9 percent overload may or may not cause a difference in the upgrade. It just depends on the situation and the solutions that are identified. If I could just make one point to Judge Ginsburg's question about, well, if we go back in time now, why is there uncertainty? The reason that there's uncertainty as to whether the cost that they have now complained about paying they would have to pay is because the system changes. I mean, the system changes every day. Generators come online. Generators retire. New transmission lines go in. Transmission lines are taken out. So the universe of upgrades that Tenasca has been asked to pay for here may or may not ever be built if they don't pay for them. There may be different upgrades that get identified later if they were to, you know, restore their previous level of service. So what they're complaining about here is the upgrades that they are paying for. And those upgrades, as Ms. Pacella pointed out, went away. They did pay for one energy upgrade, and they signed a facility construction agreement with the transmission owner. It was filed at FERC. FERC accepted in February of 2024. So for at least four years now, they've been operating without having paid for virtually any of the upgrades that were needed to provide their level of network service, which, again, is an uninterruptible level of service on the AECI system, but it impacts SPP. And, again, that testimony is in the record. And one final point, just if I may, I know I'm over time, but SPP also presented evidence in this case that in real time we've noticed a problem since the Tanaska Clear Creek facility went online. And that's at JA-153 and 154. And I'd invite you to take a look at that to show that this is not just conjecture. It's not just hypothetical. SPP has actually been suffering impacts on its system since this generator rushed through the queue and went into commercial operation. Thank you. Thank you. I'll be brief. I think it's important to keep in mind that all of these upgrades and overloads that we're talking about only exist because Southwest used the wrong system study in assessing the impacts of the Clear Creek project. Network resource service, which, again, Clear Creek has not asked for and will not receive on the Southwest system. Both councils mentioned that order number 2023 is irrelevant. I think that's untrue. And FERC has asked this court to basically disregard order number 2023. And it's relied upon cases like Exile and Brooklyn Union, which do hold that the court should not consider a subsequent agency decision to invalidate a prior decision. But this court has held that it may consider changes in agency policy when considering a current appeal. And order number 2023 is, without question, a major, major change in policy by FERC. And I would just cite the court to the Con Ed case, which all of the parties have cited in their briefs. But on page 284, the court does say, we have sometimes remanded if the agency has changed the rule underlying a decision pending review. That is clearly what's happened here. Council for FERC talked about the reliability issues. Judge Ginsburg, you mentioned the cost causation question and the impacts. If I may, just read you one line from FERC's own order number 2023 that speaks directly to the issue that council raised. FERC said, we find that any significant impact would generally be captured by an energy-only study, which would ensure that any reliability impacts on the affected system are mitigated to accommodate the interconnection of the affected system interconnection customers proposed generating facility to the host system. I mean, that's exactly our argument in black and white. And it's the exact opposite of what council just said. And this is FERC speaking here. So the bottom line is, we think that FERC has expressly declared that studying an interconnection request using network service standards results in unjust and unreasonable rates. And that's in this case, would be upholding rates that FERC itself has declared are unjust and unreasonable. And we think that result really should not stand. Super. In your brief, in the gray brief, your response to FERC's suggestion that the case is moot is along the lines of, yes, we downgraded our request to service only, but it wasn't voluntary. That's right. Why? It doesn't have to be voluntary to be moot. Well, your honor, to my understanding, we've never seen a case where a party has to be, has to render, allow itself to be rendered and as of right now, your request is for interruptible service and all of the large sums of money that are discussed in the briefs are not, you're not obligated to pay. Well, your honor, right now, today, my client is being deprived of utilizing network resource service, a far more valuable level of service on its host system, associated electric system for one reason. And that reason is it was ordered to pay $87 million on Southwest system. And Southwest is going to study my client's interconnection based on an unlawful study standard, the network resource standard. That reason you've downgraded the request and you're going to be, by your own representation, likely going to be seeking network service from associated, I don't know when. Only if this court vacates and remands, can we do that? Why you can drop your, you can remain on, well, I'm not sure I understand that. Why can't you remain taking interruptible service from Southwest? We can, we're not taking any service from Southwest. We're not, we're not interconnected. We can only take- Upgrade your request. And in fact, if you start it over, it'd be governed by the new rulemaking. Well, we're not sure how the new rulemaking will turn out, but what our argument is- This one's not very helpful. Yeah. Our argument is that FERC got it wrong in this case and that allowance- If this case is moot. Well, respectfully, I don't think that, I don't think the case is moot because again, I think that that Clear Creek is suffering harm. You said, well, it's not speculative because you're going to seek service, network service. We cannot do that though, if we have the threat of further network service studies hanging over our head, which will result in costs we can't afford to pay. But it's been represented that these studies will not be the governing studies when you later make your network upgrade request. We don't know that for certain, but we do know- Well, they have to study it as of the time you make the request. But they shouldn't have to study it at all. That's the point. We've already, there's already been an energy only study and we're willing to pay the upgrades based on that energy only study. The notion that Southwest is threatening to restudy the project based on network service standards, that's what we say is illegal. And that's what they're threatening to do. And that's what this court has the power to prevent. And that's what FERC says should happen. I think you've pointed to things in the 2023 order suggesting that that's not what will happen. Right. What will happen is that you will be evaluated for the service that you request. Well, your honor, that assumes that the order 2020 appeal runs its course. But as of today, Southwest and today being as represented in an intervener's brief, Southwest is saying that they will restudy the Clear Creek project based on network resource service if we seek to upgrade our level of service on our host system. And that's what got us in this problem. That's what resulted in the $87 million of upgrades. And until they're told, no, you cannot study Clear Creek using this improper level of service that Clear Creek hasn't asked for and won't receive, we've got a problem. And that's why I would urge the court to conclude that this case is not moot. It's over harm that my client is suffering today. It's unable to pick up the phone and call Associated Electric and say, we want to upgrade to network resource service because we're going to be studied by Southwest using the improper and we think unlawful level of service, the network resource level. And that's what resulted in all of the upgrade costs that we're talking about today. Just one last question on the other issue. Okay. As my question suggested, assume I think it matters whether the upgrade you were required to pay for was more expensive because you were the last in line instead of the first in line. Is there evidence in the record that that's actually the case? Your Honor, I'm not aware of evidence to the record along those lines either, but I do think it's important to note that other transmission providers screen out those pre-existing overloads and Southwest isn't doing that, of course. And that's what we say creates the situation where we've got this imbalanced overload that we've got to pay 100%. Counsel, are you aware of any prior case, either law case or just instance in which a utility has, provider has built it before knowing what its costs were going to be? I'm not. I'm not aware of that situation. The story is quite a bit more complicated than counsel led on. I mean, the Clear Creek did commence construction about a year after the initial study. In the initial study, Clear Creek was only assigned energy only costs. It was about $30 million. And then Southwest, based on a higher acute customer dropping out of the queue, did do a restudy. But in that restudy, they took about a year instead of the required couple of months, I think it is. And they added back 45 megawatts of power that they had just erroneously lost. And that is why the costs ballooned from $30 million to over $100 million. When you say erroneously lost, you're not referring to the loss of one of the part of the load. It was on a different system. But yes, it was 45 megawatts of power that they did not, 4,500 megawatts of power that they did not consider in the initial study. And that is what caused the network resource services to explode in the restudy. And yes, that did happen after Clear Creek had begun construction. That's because some service taker went away. That's correct. That's what triggered the restudy. But what caused the ballooning of costs was the erroneous omission of 4,500 megawatts. Okay, so those are two different things. Two different things. My only point is that that restudy process conducted by Southwest was really defined by negligence and gross errors. Thank you. We will take the next question.
judges: Childs, Garcia, Ginsburg